### PEOPLE v. LATHERS.

1. CRIMINAL LAW—DIRECTED VERDICT—INSTRUCTIONS AS TO DUTY OF JURY TO CONVICT UNDER UNDISPUTED FACTS.

In a criminal case the trial judge may state to the jury that the law applied to the facts, which are undisputed, shows the defendant to be guilty of the offense charged, and that it is their duty to so find under the facts and 'the law, but he may not, in so many words, direct them that they must bring in a verdict of guilty.

2. SAME—OBSCENITY—DIRECTED VERDICT.

In a prosecution for printing and publishing obscene matter in violation of 3 Comp. Laws 1915, § 15474, the trial court was in error in instructing the jury to return a verdict of guilty as charged, even if, under the undisputed facts, he might have told them that it was their duty to do so, since the defendant was entitled, under the Constitution, to the verdict of the jury.

3. SAME—TRIAL—INSTRUCTIONS—INTENT PRESUMED.

Where it was undisputed that while defendant was in charge of the paper as proprietor and editor copies of that paper containing the objectionable articles charged

On unlawfulness of obscene and indecent publications, see note in 24 L. R. A. 110.

were printed and sold and also mailed to subscribers, reaching at least one family, the trial court rightly held that the intent of defendant as to those facts was conclusively presumed.

4. SAME—OBSCENITY—DUTY OF COURT TO CONSTRUE WRITINGS.

It was the duty of the trial court to construe writings put in evidence, and general rules relating to giving instruction thereon to the jury are applicable to prosecutions for obscenity.

5. SAME— WHETHER WORDS USED TENDED TO CORRUPT MORALS QUESTION FOR JURY.

If the objectionable articles had been openly couched in vulgar and obscene words, or could, as a whole, have but one possible meaning, which was in import obscene and such as tended to corrupt the morals of youth, it would have been the duty of the court to so instruct the jury, but where they contained no words necessarily vulgar, obscene or immoral, but the combination in which they were used disclosed a thinly camouflaged indecent and obscure so-called joke, it was a question for the jury as to whether the items as printed tended to corrupt the morals of youth within the meaning of the statute, although the court could very properly have instructed the jury as to the indecent and vulgar meaning of which the language was susceptible.

Exceptions before judgment from Oceana; Vanderwerp (John), J.    Submitted April 17, 1923.    (Docket No. 120.)    Decided June 4, 1923.

Swift Lathers was convicted of publishing obscene language in a newspaper.    Reversed.

*Swift Lathers, in pro. per.*

*Earl C. Pugsley,* Prosecuting Attorney, for the people.

STEERE, J.    Defendant edits and publishes in the village of Mears, Oceana county, Michigan, a pamphlet-sized newspaper called "The Mears Newz."    He is charged in the information filed against him with

violating the provisions of section 15474 of the Compiled Laws of 1915 which makes it an offense punished by fine or imprisonment to print, publish, sell or distribute any pamphlet or printed paper containing obscene language, pictures, figures or descriptions manifestly tending to corrupt the morals of youth, or to introduce into any family or have in possession any such pamphlet, printed paper, etc., for the purpose of sale, exhibition or circulation with intent to introduce the same into any family, school or place of education.

It is charged that on January 5, 1922, defendant printed, published, sold and distributed a copy of the Mears Newz containing obscene language, figures and descriptions of a nature manifestly tending to corrupt the morals of youth, which are set out at large in the information. On the trial it was shown that copies of the issue of the Mears Newz of that date contained the alleged indecent items, that some copies were sold and at least two copies were received through the post office by subscribers to the paper, one being a married man with a family, who testified that he received the same through the post office as he received any other mail.

Defendant took the stand as a witness in his own behalf and "as bearing upon the question of the absence of any immoral intent" delivered an eulogistic autobiography to the effect that in his childhood he did not attend school until he was 9 years of age but was privately taught at home with a view to his becoming a clergyman; that nevertheless his educational advancement was such that when 17 years of age he was through high school and in college with credits for advance standing for one-fourth of his course in college, and when 19 years of age he was a superintendent of schools, licensed to teach in any school of the State and followed that profession for some years;

but his tastes were strictly literary and instead of aspiring to teaching or preaching his ambition was to be a poet, to which end he told the jury that he made search for "a peaceful, country village where I might gain the great poise and perspective vision that a poet must have." Having discovered Mears with its "exhilarating winds that blow from the big lake" he thought it would be an ideallic spot for his work as a poet, and said that he did there find "inspiration in the people as well as in birches and dunes and running waters. I was a bookworm and a recluse and I must come out of it. So I started the Mears Newz and became an editor, because as an editor I could go and see everybody and know everybody, and study life intensively, because I had the open sesame to every door. So for several years I have been going into the factories to talk to the workers, into the orchards to talk with the girls on the step-ladders, into the schools to talk with the children on the playgrounds, and into the homes of the people." He also commented on his abstemious habits in life with some detail, to the effect that he was a man without guile or vices, either small or great, and said he so lived because "as a writer I wanted to have a clear-ringing brain, so I could be keenly and intensely alert and write with great force. * * * I wanted to be a poet and wanted to develop within me the poetic emotions to the highest possible stage of development, * * * I have never used any of the common indecent words of life in my conversation. Not only do I not speak them but I do not allow my mind to form a mental image of them. To think only the brightest and highest thoughts has been my religion ever since I can remember."

On cross-examination he testified that the charged indecent items were furnished him by Bert Post and only printed in a comparatively few copies of the paper

as a piece of job printing at the solicitation of Post, to whom defendant was under obligations, but by accident a few copies were mailed. Personally he did not discover any joke in them or possible sinister meaning as imputed by the prosecution. He, however, admitted that the copies containing those items were stamped "Extra Wild," and several were sold to a Mr. Brubaker, and to Bert Post who said he wanted a few extra copies to send to some friends in Lansing.

The charged offending paragraphs in the Extra Wild copies of the Mears Newz are a punning type of coarse effort at wit with a double entendre by playing upon two senses of the same word or words in the combination used, superficially disguising by a harmless, but pointless, statement an apparently intended and grossly vulgar so-called joke, palpably indecent and obscene within the meaning of the act. For like reasons, as stated in *People* v. *Girardin*, 1 Mich. 90, and cases there cited, these paragraphs will not be quoted.

At close of the testimony both parties moved for a directed verdict. The trial court held the question of intent was not involved, that the publication complained of contained obscene matter within the meaning of the statute tending to corrupt the morals of the youth into whose hands it might fall, and directed the jury to find defendant guilty, saying they should retire "notwithstanding the court had directed a verdict," but ordered that when they returned into court and were asked if they had agreed upon a verdict, their foreman should answer that their verdict was guilty as charged, concluding: "In other words your verdict in form in this case will be, 'We find the respondent guilty as charged.'" Under such unqualified command of the court, retirement of the jury served no purpose and was but an idle ceremony. In-

stead of telling the jury what it was their duty to decide as a matter of law, the court told them it was his duty to order a verdict of guilty, and so commanded.

Such mandatory method of divesting the jury of all responsibility in a criminal case, even where it is proper for the court to tell them what their duty is, has more than once been a subject of criticism although, on the theory no miscarriage of justice was apparent, verdicts of that class have been sustained where all the essential facts were undisputed, following the liquor case of *People* v. *Neumann,* 85 Mich. 98, where conviction was sustained, but the court there laid down the true rule for the trial court's guidance as follows:

"The trial judge may, with perfect propriety, state to the jury that the law applied to the facts, which are undisputed, shows the defendant to be guilty of the offense charged, and that it is their duty to so find under the facts and the law. But it has been repeatedly held that he cannot in so many words direct them that they must bring in a verdict of guilty; and that they are at liberty to find otherwise, if they see fit, under the Federal Constitution, which guarantees to every accused person—

"'The right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed.'

"And verdicts have often been set aside when directed by courts in opposition to this right. See *United States* v. *Taylor,* 11 Fed. 470, and cases there cited."

This court has so frequently and recently had occasion to touch upon that subject where it was claimed the court by instructions less mandatory than here invaded a defendant's constitutional rights that further comment seems superfluous.

223—Mich.—7.

In the instant case the facts appear undisputed that while defendant was in charge of the Mears Newz as proprietor and editor copies of that paper were printed and sold containing the objectionable articles charged, and also mailed to subscribers, reaching at least one family through that channel. The court rightly held that under the sustained counts in the information intent of the accused as to those facts was conclusively presumed; but that the items complained of on their face conclusively tended to corrupt the morals of youth was also a fact essential to conviction, which defendant denied and contended was an issue of fact for the jury, if the court held that the language used could in any sense come within the prohibition of the statute.

Admittedly it is a general rule that the court shall construe writings put in evidence, and general rules relating to giving instructions to the jury are applicable to prosecutions for obscenity. If these paragraphs were openly couched in vulgar and obscene words, or could as a whole have but one possible meaning, which was in import obscene and such as tended to corrupt the morals of youth, it would unquestionably be the right of the court to so instruct the jury in positive terms; but they in fact contain no words which necessarily, as generally known and commonly used, are vulgar, obscene or even immodest, yet the combination in which they are used discloses in one sense a thinly camouflaged indecent and obscene so-called joke, which defendant contends that he and others of like purity and innocence of thought would not discern because "to the pure all things are pure." Unfortunately, the pure in heart do not always remain so, and it was for their protection this law was passed.

In construing this composition the court could very

properly instruct the jury as to the indecent and vulgar meaning of which the language used is susceptible but whether as composed and published its tendency was to corrupt the morals of youth was yet a question of fact, which carried the case to the jury. In the charge directing a verdict the court for the most part very ably explained the nature and purpose of the law, and fairly covered the ground in this controversy, but in deciding questions of fact and unconditionally commanding a verdict, we are impressed that he invaded the province of the jury. It is said in 29 Cyc. p. 1323, with supporting authority, both Federal and State:

"While it has been held that the question whether or not a particular publication is obscene is for the court, the better rule undoubtedly is that it is for the jury, under instructions from the court as to the meaning of the words."

The peculiar character of the literary effort under consideration is such that in our opinion defendant is entitled to the judgment of the jury as to its evident obscenity and whether its circulation and introduction into the homes of that community would tend to corrupt the morals of youth.

The various other questions raised by defendant are not found to demand discussion or serious consideration.

For the reasons stated, the directed verdict is set aside and a new trial granted.

WIEST, C. J., and FELLOWS, MCDONALD, CLARK, BIRD, and SHARPE, JJ., concurred. MOORE, J., did not sit.